**E-FILED**
Friday, 17 September, 2004  12:58:33 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | CIVIL NO._____ |
| | ) | |
| GLOBAL BENEFITS GROUP CORP., | ) | |
| | ) | |
| EILEEN DE OLIVEIRA, both individually and in her | ) | |
| capacity as General Manager of Global Benefits Group | ) | |
| Corp., and in any other office or position she holds with | ) | |
| Global Benefits Group Corp., | ) | |
| | ) | |
| LEONARDO DE OLIVEIRA, both individually and in his | ) | |
| capacity as President of Global Benefits Group Corp., | ) | |
| | ) | |
| John Doe 1, d/b/a INTERNATIONAL MARKETING | ) | |
| SERVICE and d/b/a MEDICATIONS FOR LESS, and | ) | |
| | ) | **COMPLAINT FOR** |
| John Doe 2, d/b/a EURO BANCA, | ) | **INJUNCTION AND** |
| | ) | **OTHER EQUITABLE** |
| Defendants. | ) | **RELIEF** |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

1.   NOW COMES the plaintiff, THE PEOPLE OF THE STATE OF ILLINOIS, by LISA MADIGAN, Attorney General of the State of Illinois, and brings this action pursuant to the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §6101, *et seq*., ("Telemarketing Act"), complaining of the defendants. Plaintiff seeks a permanent injunction and other equitable relief, based upon the defendants' violations of the Telemarketing Act in connection with placing telemarketing solicitations to consumers.

2.   Plaintiff, as part of the same case or controversy, also brings this action pursuant to the

Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*,

("Consumer Fraud Act"), the Credit Services Organization Act, 816 ILCS 605/1, *et seq*., and

Attorney General Madigan's common law authority to represent the people of the State of

Illinois.

## JURISDICTION AND VENUE

3.   This court has jurisdiction over this matter pursuant to 28 U.S.C. §§1331 and 1337(a) and

15 U.S.C. §6103(a), and supplemental jurisdiction over the state claims pursuant to 28

U.S.C. §1367.

4.   Venue in this matter is proper in this judicial district pursuant to 28 U.S.C. §1391(b), in that

a substantial part of the events or omissions giving rise to the claim occurred in this judicial

district.  Venue is also proper in this judicial district pursuant to 15 U.S.C. §6103(e), in that

defendant transacts business in this district, and violations of the Telemarketing Act have

occurred in this district.

5.   The plaintiff notified the Federal Trade Commission of this civil action in writing on or

about September 13, 2004.

## PARTIES

6.   The plaintiff, as *parens patriae*, by and through its attorney, Lisa Madigan, Attorney

General, is authorized by 15 U.S.C. §6103 to file actions in federal district court to enjoin

violations of and enforce compliance with the Telemarketing Act on behalf of residents of

the State of Illinois, and to obtain damages, restitution, or other compensation on behalf of

residents of Illinois, or to obtain such further and other relief as the court may deem

appropriate.

7.   The plaintiff, by Lisa Madigan Attorney General of the State of Illinois, is charged, *inter*

*alia*, with the enforcement of the Consumer Fraud Act and the Credit Services Organization Act.

8.     Defendant Global Benefits Group Corp. ("GLOBAL BENEFITS") is a corporation organized under the laws of the State of Florida, with its principal place of business at 10011 Pines Boulevard, Suite 202, Pembroke Pines, Florida 33024.   GLOBAL BENEFITS formerly was located at  4000 North 30th Avenue, Hollywood, Florida 33202.

9.     GLOBAL BENEFITS has not obtained from the Illinois Secretary of State a certificate of authority to transact business in Illinois as a foreign corporation.

10.    Defendant Eileen de Oliveira ("EILEEN DE OLIVEIRA") is sued in both her individual capacity and in her capacity as General Manager of GLOBAL BENEFITS, and in any other office or position she holds with GLOBAL BENEFITS.

11.    EILEEN DE OLIVEIRA formulated, directed, controlled and had knowledge of the acts and practices of GLOBAL BENEFITS, and, at all times relevant hereto, was an officer, director, owner and/or agent of GLOBAL BENEFITS.

12.    To adhere to the fiction of separate corporate existence between EILEEN DE OLIVEIRA and GLOBAL BENEFITS, would serve to sanction fraud and promote injustice.

13.    Defendant Leonardo de Oliveira ("LEONARDO DE OLIVEIRA") is sued in both his individual capacity and in his capacity as President of GLOBAL BENEFITS.

14.    LEONARDO DE OLIVEIRA  formulated, directed, controlled and had knowledge of the acts and practices of GLOBAL BENEFITS, and, at all times relevant hereto, was an officer, director, owner and/or agent of GLOBAL BENEFITS.

15.    To adhere to the fiction of separate corporate existence between LEONARDO DE OLIVEIRA and GLOBAL BENEFITS, would serve to sanction fraud and promote injustice.

16.    Upon information and belief, Defendant John Doe 1, doing business as INTERNATIONAL

MARKETING SERVICE and as MEDICATIONS 4 LESS ("MEDICATIONS 4 LESS") is

located at 4055 Rue Sainte-Catherine, Westmount, Quebec, Canada H3Z 3J8. It is unknown

to the plaintiff and known to MEDICATIONS 4 LESS and to GLOBAL BENEFITS whether

this location is correct, and whether any additional locations exist for MEDICATIONS 4

LESS.

17.    The location of Defendant John Doe 2, doing business as Euro Banca ("EURO BANCA"),

is unknown to the plaintiff and known to EURO BANCA and GLOBAL BENEFITS.

18.    For purposes of this Complaint, any references to the acts and practices of GLOBAL

BENEFITS, MEDICATIONS 4 LESS, or EURO BANCA shall mean that such acts and

practices are by and through the acts of said entity's owners, officers, directors, employees,

partners, or other agents.

## TRADE AND COMMERCE

19.    GLOBAL BENEFITS was, at all times relevant hereto, engaged in trade and commerce in

the State of Illinois, to-wit: debiting money from, or causing money to be debited from, bank

accounts of consumers nationwide, including those of Illinois consumers, and taking

complaints, inquiries, and refund requests about the same from consumers located in Illinois

and throughout the United States.

20.    MEDICATIONS 4 LESS was, at all times relevant hereto, engaged in trade and commerce

in the State of Illinois, to-wit: placing telemarketing calls to, or causing telemarketing calls

to be placed to, offering for sale to, and selling purported discount prescription cards to

consumers nationwide, including Illinois consumers. MEDICATIONS 4 LESS also debited

consumers' checking accounts, including those of Illinois consumers, or caused such

accounts to be debited.

21.    EURO BANCA was at all times relevant hereto, engaged in trade and commerce in the State of Illinois, to-wit: placing telemarketing calls to, or causing telemarketing calls to be placed to, offering for sale to, and selling  to consumers nationwide, including Illinois consumers, purported credit cards, purported cash advances, and purported credit repair services.  EURO BANCA also debited  consumers' checking accounts, including those of Illinois consumers, or caused such accounts to be debited.

**DEFENDANTS' BUSINESS PRACTICES**

22.    Illinois consumers have complained that their checking accounts were debited $299, $398, or $399 for products or services they did not request and did not agree to purchase.

23.    These debits from Illinois consumers' checking accounts were effected using demand drafts, negotiable instruments created and paid without the signature of the account holder.

**Medications 4 Less**

24.    Some of the $299 debits from Illinois consumers' checking accounts were initiated after MEDICATIONS 4 LESS contacted the consumers via a telemarketing call and led consumers to believe that they were offering discounted prescription medications to senior citizens as part of a government program or government-sponsored program.

25.    Some consumers report that MEDICATIONS 4 LESS offered them an 80% discount on their prescription medications.

26.    Many of these consumers are registered on the National Do Not Call Registry, do not have an established business relationship with MEDICATIONS 4 LESS, and have not granted written permission to MEDICATIONS 4 LESS to place telemarketing solicitations to them.

27.    MEDICATIONS 4 LESS then solicited from the consumers the numbers located at the

5

bottom left corner of their checks. These numbers indicate the bank where the consumer's checking account is located and the account number of the checking account.

28. Once MEDICATIONS 4 LESS obtained what it construed to be a positive response to its offer and the information from the consumer's check, it then sent the checking account information to GLOBAL BENEFITS, pursuant to its agreement with GLOBAL BENEFITS.

29. GLOBAL BENEFITS also has a contract with AmeriNet, Inc., a third party payment processor.

30. When GLOBAL BENEFITS receives consumer checking account information from MEDICATIONS 4 LESS, it in turn provides the information to AmeriNet, Inc., which then initiates a debit from the consumer's checking account.

31. An actual check which appears to be from the consumer's checking account is created on desktop software.

32. The consumer does not sign the check.

33. This process is legal under federal law if the proper authorization is first obtained.

34. The money from the consumer's checking account is deposited into AmeriNet, Inc.'s account and then distributed to GLOBAL BENEFITS, less any fees and other offsets, pursuant to the agreement between AmeriNet, Inc. and GLOBAL BENEFITS.

35. GLOBAL BENEFITS then distributes the money to MEDICATIONS 4 LESS, less any fees and other offsets, pursuant to the agreement between GLOBAL BENEFITS and MEDICATIONS 4 LESS.

36. GLOBAL BENEFITS has connected dozens of its clients, including MEDICATIONS 4 LESS and EURO BANCA, with AmeriNet, Inc.'s check debiting services.

37. Consumers who are deemed to have accepted the offer from MEDICATIONS 4 LESS are

sent a welcome packet containing a membership card with username and password, some prescription cost information, frequently asked questions, a pad of paper, coupons for free delivery, and a solicitation for health benefits, such as discounts on medical and dental care and prescription drugs.

38.     In order to purchase any products using a MEDICATIONS 4 LESS membership, consumers must log onto the MEDICATIONS 4 LESS website at <u>medications4less.net</u> or call a toll-free telephone number.

<u>MEDICATIONS 4 LESS Scripts</u>

39.     A sample telemarketing script which GLOBAL BENEFITS provided to AmeriNet, Inc. for MEDICATIONS 4 LESS states that the caller is calling "...with regards to your prescription medication.  It shows in my computer that you have been approved for a 50% discount on your prescriptions."

40.     The MEDICATIONS 4 LESS telemarketing script goes on to ask the consumer how much he or she spends on prescriptions per month and calculate how much money a consumer would save on those prescriptions with a 50% discount through MEDICATIONS 4 LESS.

41.     The verification script, which purportedly is read to the consumer once he or she already has agreed to purchase the MEDICATIONS 4 LESS discount prescription card and has provided his or her checking account number, states that he or she  will save "anywhere between 30-50% on your prescription medication cost as compared to the retail price in U.S. ..."

42.     Some consumers report that MEDICATIONS 4 LESS offered an 80% discount on their prescription medications.

43.     MEDICATIONS 4 LESS does not know how much each consumer pays for his or her

prescription drugs or whether the MEDICATIONS 4 LESS prices are lower at all or by any specified percentage compared to what the consumer currently pays.

**Euro Banca**

44. Some of the debits to Illinois consumers' checking accounts are in the amount of between $229 and $398 for a purportedly guaranteed credit card from EURO BANCA.

45. Consumers whose checking accounts were debited at the request of EURO BANCA report that they received telemarketing solicitations wherein the caller promised them an unsecured low interest rate credit card for a fee.

46. Many of these consumers are registered on the National Do Not Call Registry, do not have an established business relationship with EURO BANCA, and have not granted written permission to EURO BANCA to place telemarketing solicitations to them.

47. EURO BANCA then solicited from the consumers the numbers located at the bottom left corner of their checks. These numbers indicate the bank where the consumer's checking account is located and the account number of the checking account.

48. Once EURO BANCA obtained what it construed to be a positive response to its offer and the information from the consumer's check, it then sent the checking account information to GLOBAL BENEFITS, pursuant to its agreement with GLOBAL BENEFITS.

49. GLOBAL BENEFITS also has a contract with AmeriNet, Inc., a third party payment processor.

50. When GLOBAL BENEFITS receives consumer checking account information from EURO BANCA, it in turn provides the information to AmeriNet, Inc., which then initiates a debit from the consumer's checking account.

51. An actual check which appears to be from the consumer's checking account is created on

8

desktop software.

52.   The consumer does not sign the check.

53.   This process is legal under federal law if the proper authorization is first obtained.

54.   The money from the consumer's checking account is deposited into AmeriNet, Inc.'s account and then distributed to GLOBAL BENEFITS, less any fees and other offsets, pursuant to the agreement between AmeriNet, Inc. and GLOBAL BENEFITS.

55.   GLOBAL BENEFITS then distributes the money to EURO BANCA, less any fees and other offsets, pursuant to the agreement between GLOBAL BENEFITS and EURO BANCA.

56.   GLOBAL BENEFITS has connected dozens of its clients, including MEDICATIONS 4 LESS and EURO BANCA, with AmeriNet, Inc.'s check debiting services.

57.   Complaining consumers report that they did not receive a credit card but were charged the fee.

Euro Banca Scripts

58.   A sample telemarketing script which GLOBAL BENEFITS provided to AmeriNet, Inc. for EURO BANCA  states that the consumer has been "Guaranteed approved for a Visa or MasterCard...", and that the consumer "will automatically be issued a low interest rate <u>unsecured</u> **EURO-BANCA CREDIT CARD**... YOUR ACCEPTANCE IS **<u>100%</u> <u>APPROVED.</u>**" (Emphasis in original).

59.   The script also promises "...a free credit report with professional help available to clear  your credit, eliminate debt, get creditors off your back, lower your interest, cut your payments in half, and give you the down payment money to buy your next house or condo. ..."

**Global Benefits- Services to its Clients**

60.   GLOBAL BENEFITS has provided substantial assistance and services to its clients, which

9

include MEDICATIONS 4 LESS and EURO BANCA.

61.  GLOBAL BENEFITS has provided access to check debiting services, which enables its clients to obtain payment for services and/or products offered via cold telemarketing calls.

62.  In order to provide access to check debiting services, GLOBAL BENEFITS solicited and obtained the information necessary to complete an application to AmeriNet, Inc. for check debiting services, which includes a description of the services and products offered by the client.  In addition, GLOBAL BENEFITS obtains and submits to AmeriNet, Inc. telemarketing and verification scripts and welcome packets.  Welcome packets typically are envelopes with the vendor's name on them, contain materials related to the product or service which the consumer purportedly agreed to purchase, and are sent to the consumer after he or she purportedly agreed to purchase the product or service.

63.  GLOBAL BENEFITS either creates the bank draft or requests that the processor (AmeriNet, Inc.) create the bank draft with the client's name on the draft.

64.  In some instances, GLOBAL BENEFITS provided customer service for the products and services offered by its clients and initiated refunds to consumers' checking accounts where requested.

65.  GLOBAL BENEFITS has advertised its clients' services on its website.

**Global Benefits, Eileen de Oliveira, and Leonardo de Oliveira**

66.  At all times relevant to this complaint, GLOBAL BENEFITS, EILEEN DE OLIVEIRA, and LEONARDO DE OLIVEIRA knew of the acts and practices of MEDICATIONS 4 LESS and of EURO BANCA and, as part of their business model, routinely substantially assisted MEDICATIONS 4 LESS and EURO BANCA with conducting those acts and practices, as described hereinabove at paragraphs 60 through 65.

10

67.     EILEEN DE OLIVEIRA has been involved heavily in the daily interface between GLOBAL BENEFITS and AmeriNet, Inc., in that she, among other things, completed the applications for each new seller, is the contact person for most of GLOBAL BENEFITS' vendors, provided the scripts and welcome packets to AmeriNet, Inc. for each vendor, and was the contact for most other issues between GLOBAL BENEFITS and AmeriNet, Inc., including daily payouts from AmeriNet, Inc. to GLOBAL BENEFITS and the calculation of those payouts and return rates for GLOBAL BENEFITS' vendors.

68.     The calculation of the daily payouts from AmeriNet, Inc. was calculated based on the number of sales, the number of refunds, and in some instances, the number of customer service minutes used.  This information was broken down by client.

69.     EILEEN DE OLIVEIRA received detailed information on how the daily payout calculations were made, and, therefore, knew if refunds or customer service minutes were high for a particular client.

70.     In some instances, GLOBAL BENEFITS provided customer service to some of its clients, meaning that it acted as a contact point for consumer inquiries, complaints, and refund requests.

71.     The types of products and services that have been offered by these telemarketers for which GLOBAL BENEFITS has arranged checking account debiting services and has provided other services and assistance has included several different purported credit repair/credit card offering services, some purported prescription discount cards, some identity theft prevention kits, some credit repair kits, and some telemarketing prevention kits.

72.     The fee for these telemarketers' products and services for which GLOBAL BENEFITS provides access to checking account debiting services typically ranges from about $200 to

11

about $400.

73. Between September 29, 2003 and May 27, 2004, GLOBAL BENEFITS caused to be debited a minimum of $471,095.79 from Illinois consumers' checking accounts. As of May 27, 2004, at least $335,196.73 of that amount has been returned or otherwise credited to those Illinois consumers, for a minimum total return rate of 71.15%.

<u>Global Benefits' Contract with AmeriNet, Inc.</u>

74. The contract between GLOBAL BENEFITS and AmeriNet, Inc. calls for AmeriNet, Inc. to provide check debit transaction services for GLOBAL BENEFITS.

75. The contract states that GLOBAL BENEFITS "...will not transfer to AmeriNet transactions, of any type, originating from, or on behalf of: ... 2.2 Any person or organization who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of improving any consumer's credit record, credit history, or credit rating; or providing advice or assistance to any consumer with regard to any activity or service described in this paragraph."

76. Despite its contractual promise, GLOBAL BENEFITS has transferred to AmeriNet, Inc. transactions on behalf of sellers who offer credit repair services in exchange for money.

## CONSUMER INJURY

77. Consumers throughout Illinois and the United States have been injured, and the potential for substantial monetary loss continues, as a result of the defendants' unlawful acts or practices.

## APPLICABLE STATUTES

## FEDERAL

12

**TELEMARKETING AND CONSUMER FRAUD AND ABUSE PREVENTION ACT
AND TELEMARKETING SALES RULE PROMULGATED PURSUANT TO SAME**

78.   In 1994, Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108. On August 16, 1995, the FTC adopted the TSR (the "Original TSR"), 16 C.F.R. Part 310, which became effective on December 31, 1995.  On January 29, 2003, the FTC amended the TSR by issuing a Statement of Basis and Purpose and the amended TSR (the "Amended TSR").  68 Fed. Reg. 4580, 4669.

<u>National Do Not Call Registry</u>

79.   Among other things, the Amended TSR established a "do-not-call" registry, maintained by the Commission (the "National Do Not Call Registry" or "Registry"), of consumers who do not wish to receive certain types of telemarketing calls.  Consumers can register their telephone numbers on the Registry without charge either through a toll-free telephone call or over the Internet at <u>donotcall.gov</u>.

80.   Sellers, telemarketers, and other permitted organizations can access the Registry over the Internet at <u>telemarketing.donotcall.gov</u> to download the registered numbers.  Sellers and telemarketers are prohibited from calling registered numbers in violation of the TSR.  16 C.F.R. § 310.4(b)(1)(iii)(B).

81.   Consumers who receive telemarketing calls to their registered numbers can complain of Registry violations the same way they registered, through a toll-free telephone call to 1-888-382-1222 or over the Internet at <u>donotcall.gov</u>, or by contacting law enforcement.

82.   On or after October 17, 2003,[1] The FTC began enforcement of the National Do Not Call

---

[1]   FTC enforcement of violations of the National Do Not Call Registry, which was originally planned to commence on October 1, 2003, was deferred.  *See U.S. Security v. FTC*, 2003 U.S. Dist. LEXIS 16650 (W.D. Okla. Sept. 23, 2003) (granting summary judgment against the FTC for lacking statutory authority to create the Registry) *but see*

Registry against all seller and telemarketers subject to the FTC's jurisdiction.

83.     MEDICATIONS 4 LESS is a "seller" or "telemarketer" engaged in "telemarketing," as

defined by the TSR, 16 C.F.R. § 310.2.

84.     MEDICATIONS 4 LESS has engaged in telemarketing by a plan, program, or campaign

conducted to induce the purchase of goods or services by use of one or more telephones and

which involves more than one interstate telephone call.

85.     On or after October 17, 2003, MEDICATIONS 4 LESS, without authorization or other

defense, has called consumers' telephone numbers that are on the National Do Not Call

Registry.

### Misrepresenting Nature of Goods or Services Offered

86.     Section 310.3(a)(2)(iii) of the Amended TSR provides in part, "...It is a deceptive

telemarketing act or practice and a violation of this Rule for any seller or telemarketer to

engage in the following conduct: ... (2) Misrepresenting, directly or by implication, in the

sale of goods or services any of the following material information... (iii) Any material

aspect of the performance, efficacy, nature, or central characteristics of goods or services

that are the subject of a sales offer..."

### Misrepresenting a Seller's or Telemarketer's Affiliation with, Endorsement, or Sponsorship by Government Entity

87.     Section 310.3(a)(2)(vii) of the Amended TSR provides, "...It is a deceptive telemarketing

---

Act 2 (known as the "This Time We Really Mean It Act"), Pub. L. No. 108-82, 117 Stat. 1006 (Sept. 29, 2003)
(Congress confirming the provision of statutory authority).  *See also Mainstream Mktg. Servs. v. FTC*, 2003 U.S.
Dist. LEXIS 16807 (D. Colo. Sept. 25,  2003) (enjoining the FTC from enforcing the Registry due to First
Amendment concerns) *but see FTC v. Mainstream Mktg. Servs.*, 2003 U.S. App. LEXIS 20366 (10th Cir. Oct. 7,
2003) (granting stay to allow FTC enforcement).  After October 7, 2003, the FTC gave those organizations that had
not yet accessed the Registry an additional ten days to come into compliance.  Thus, full compliance with the
National Do Not Call Registry provision, § 310.4(b)(1)(iii)(B), for all entities subject to FTC jurisdiction was
required by October 17, 2003.

act or practice and a violation of this Rule for any seller or telemarketer to engage in the following conduct: ... (2) Misrepresenting, directly or by implication, in the sale of goods or services any of the following material information... (vii) A seller's or telemarketer's affiliation with, or endorsement or sponsorship by, any person or government entity".

Advance Payment for Extension of Credit

88.   Section 310.4(a) of the Amended TSR provides in part, "It is an abusive telemarketing act or practice and a violation of this rule for any seller or telemarketer to engage in the following conduct: ... (4) Requesting or receiving payment of any fee or consideration in advance of obtaining a loan or other extension of credit when the seller or telemarketer has guaranteed or represented a high likelihood of success in obtaining or arranging a loan or other extension of credit for a person..."

Providing Substantial Assistance or Support

89.   Section 310.3(b) of the Amended TSR  provides in part, "...It is a deceptive telemarketing act or practice and a violation of this Rule for a person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates §§310.3(a), (c) or (d), or §310.4 of this Rule. ..."

Attorney General Authorized to Enforce in U.S. District Court

90.   Section 6103(e) of the Telemarketing Act authorizes the Attorney General of a state to enforce the Telemarketing Act and the Amended TSR.

**STATE**

**CONSUMER FRAUD ACT**

91.   Section 2 of the Act (815 ILCS 505/2), provides:

15

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment,  suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in section 2 of the 'Uniform Deceptive Trade Practices Act', approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.  In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to section 5(a) of the Federal Trade Commission Act.

92. Subsection 1(f) of the Act [815 ILCS 505/1(f)], defines "trade" and "commerce" as follows:

The terms 'trade' and 'commerce' mean the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of this State.

93. Section 2Z of the Consumer Fraud Act (815 ILCS 505/2Z), provides in part: "Violations of other Acts. Any person who knowingly violates ... the Credit Services Organizations Act...commits an unlawful practice within the meaning of this Act."

94. Section 7 of the Consumer Fraud Act, 815 ILCS 505/7, provides:

Whenever the Attorney General has reason to believe that any person is using, has used, or is about to use any method, act or practice declared by the Act to be unlawful, and that proceedings would be in the public interest, he may bring an action in the name of the State against such person to restrain by preliminary or permanent injunction the use of such method, act or practice.  The Court, in its discretion, may exercise all powers necessary, including but not limited to:  injunction, revocation, forfeiture or suspension of any license, charter, franchise, certificate or other evidence of authority of any person to do business in this State; appointment of a receiver; dissolution of domestic corporations or association suspension or termination of the right of foreign corporations or associations to do business in this State; and restitution.

> In addition to the remedies provided herein, the Attorney General may request and this Court may impose a civil penalty in a sum not to exceed $50,000 against any person found by the Court to have engaged in any method, act or practice declared unlawful under this Act. In the event the court finds the method, act or practice to have been entered into with intent to defraud, the court has the authority to impose a civil penalty in a sum not to exceed $50,000 per violation.

95. Section 10 of the Consumer Fraud Act, 815 ILCS 505/10, provides, "In any action brought under the provisions of this Act, the Attorney General is entitled to recover costs for the use of this State".

### CREDIT SERVICES ORGANIZATIONS ACT

96. Section 5 of the Credit Services Organizations Act, 815 ILCS 505/1, *et seq.*, provides,

> No credit services organization, its salespersons, agents or representatives, or any independent contractor who sells or attempts to sell the services of a credit services organization shall:
>
> (1) Charge or receive any money or other valuable consideration prior to full and complete performance of the services the credit services organization has agreed to perform for or on behalf of the buyer, unless the credit services organization has, in conformity with Section 10 of this Act, obtained a surety bond issued by a surety company licensed to do business in this State. If a credit services organization is in compliance with this subsection the salespersons, agents, and representatives who sell the services of such organization shall not be required to obtain the surety bond provided for by this Act.
>
> (2) Charge or receive any money or other valuable consideration solely for the referral of a buyer to a retail seller who will or may extend credit to the buyer if such extension of credit is in substantially the same terms as those available to the general public.
>
> (3) Make, or advise any buyer to make, any statement that is untrue or misleading, or that should be known by the exercise of reasonable care to be untrue or misleading, with respect to a buyer's credit reporting agency or to any person who has extended credit to a buyer or to whom a buyer has made application for an extension of credit.
>
> (4) Make or use any untrue or misleading representations in the offer or sale of the services of a credit services organization or engage,

directly or indirectly, in any act, practice or course of business intended to defraud or deceive a buyer in connection with the office or sale of such services; including but not limited to: the amount or type of credit a consumer can expect to receive as a result of the performance of the services offered; the qualifications, training or experience of its personnel; or the amount of credit improvement the consumer can expect to receive as a result of the services.

97.  Section 6 of the Credit Services Organizations Act provides:

Before the execution of a contract or other form of agreement between a buyer and a credit services organization or before the receipt by any such organization of money or other valuable consideration, whichever occurs first, such organization shall provide the buyer with a statement, in writing, containing the following:

(1) a complete and accurate statement of the buyer's right to review any file on the buyer maintained by a consumer reporting agency, as provided under the Fair Credit Reporting Act (15 U.S.C. Section 1681 et seq.);

(2) a statement that the buyer may review his consumer reporting agency file at no charge if a request therefor therefore is made to such agency within 30 thirty days after receipt by the buyer of notice that credit has been denied and if such request is not made within the allotted time, the approximate charge to the buyer for such review;

(3) a complete and accurate statement of the buyer's right to dispute the completeness or accuracy of any item contained in any file on the buyer maintained by a consumer reporting agency;

(4) a complete and detailed description of the services to be performed by the credit services organization and the total cost to the buyer for such services;

(5) a statement notifying the buyer that: (i) credit reporting agencies have no obligation to remove information from credit reports unless the information is erroneous, cannot be verified or is more than 7 years old; and (ii) credit reporting agencies have no obligation to remove information concerning bankruptcies unless such information is more than 10 years old;

(6) a statement asserting the buyer's right to proceed against the surety bond required under Section 10; and

(7) the name and business address of any such surety company together with the name and the number of the account.

The credit services organization shall maintain on file, for a period of 2 years after the date the statement is provided, an exact copy of the statement, signed by the buyer, acknowledging receipt of the statement.

98.     Section 7 of the Credit Services Organizations Act provides

Each contract between the buyer and a credit services organization for the purchase of the services of the credit services organization shall be in writing, dated, signed by the buyer, and shall include:

(1) a conspicuous statement in boldfaced type, in immediate proximity to the space reserved for the signature of the buyer, as follows:

"You, the buyer, may cancel this contract at any time before midnight of the third day after the date of the transaction. See the attached notice of cancellation form for an explanation of this right";

(2) the terms and conditions of payment, including the total of all payments to be made by the buyer, whether to the credit services organization or to another person;

(3) a full and detailed description of the services to be performed by the credit services organization for the buyer, including all guarantees and all promises of full or partial refunds, and the estimated date by which the services are to be performed or the estimated length of time for performing the services; and

(4) the address of the credit services organization's principal place of business and the name and address of its agent in the State authorized to receive service of process.

(b) The contract must have two easily detachable copies of a notice of cancellation. The notice must be in boldfaced type and in the following form:

"Notice of Cancellation"

"You may cancel this contract, without any penalty or obligation, within three days after the date the contract is signed.

If you cancel, any payment made by you under this contract will be returned within 10 days after the date of receipt by the seller of your cancellation notice.

To cancel this contract, mail or deliver a signed, dated copy of this

19

cancellation notice, or other written notice to:

>  (name of seller) at (address of seller) (place of business)
>  not later than midnight (date)

I hereby cancel this transaction."

............................ .......................................

(date) (purchaser's signature)

(c) The credit services organization shall give to the buyer a copy

of the completed contract and all other documents the credit
services organization requires the buyer to sign at the time they are
signed.

99.   Section 8 of the Credit Services Organizations Act provides in part, "Any contract for

services which does not comply with applicable provisions of this article shall be void

and unenforceable as contrary to public policy."  815 ILCS 605/8.

100.   "Credit Services Organization" is defined in Section 3 of the Credit Services

Organizations Act as "a person who, with respect to the extension of credit by others and

in return for the payment of money or other valuable consideration, provides, or

represents that the person can or will provide, any of the following services: (i)

improving a buyer's credit record, history, or rating; (ii) obtaining an extension of credit

for a buyer; or (iii) providing advice or assistance to a buyer with regard to either

subsection (i) or (ii).

101.   "Extension of Credit" is defined in Section 3 of the Credit Service Organizations Act as

"the right to defer payment of a debt or to incur a debt and defer its payment offered or

granted primarily for personal, family, or household purposes."

102.   EURO BANCA is a Credit Services Organization as defined in the Credit Services

Organizations Act.

20

103. Section 15 of the Credit Services Organizations Act provides in part, "A violation of this shall also constitute a violation of the Consumer Fraud and Deceptive Business Practices Act."

## VIOLATIONS

### COUNT I- TSR (MEDICATIONS 4 LESS)

104. Paragraphs 1 through 103 are incorporated herein by reference.

105. In numerous instances, in connection with telemarketing, MEDICATIONS 4 LESS has engaged in or caused others to engage in initiating an outbound telephone call to a person's telephone number on the National Do Not Call Registry in violation of the TSR, 16 CFR § 310.4(b)(1)(iii)(B).

### COUNT II- TSR (MEDICATIONS 4 LESS)

106. Paragraphs 1 through 103 are incorporated herein by reference.

107. In numerous instances, in connection with telemarketing, MEDICATIONS 4 LESS has misrepresented, directly or by implication, material aspects of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer, in violation of 16 C.F.R. §310.3(a)(2)(iii).

### COUNT III- TSR (MEDICATIONS 4 LESS)

108. Paragraphs 1 through 103 are incorporated herein by reference.

109. In numerous instances, in connection with telemarketing, MEDICATIONS 4 LESS has misrepresented, directly or by implication, its affiliation with, or endorsement or sponsorship by, the U.S. Government, in violation of 16 C.F.R. §310.3(a)(2)(vii).

**COUNT IV- CONSUMER FRAUD ACT (MEDICATIONS 4 LESS)**

110.    Paragraphs 1 through 103  are incorporated herein by reference.

111.    MEDICATIONS 4 LESS engaged in a course of trade or commerce which constitutes unfair and deceptive acts or practices declared unlawful under section 2 of the Act by, in the course of placing telemarketing calls to, or causing telemarketing calls to be placed to, offering for sale to, and selling purported discount prescription cards to Illinois consumers, engaging in the following acts and practices:

    a.    Representing, expressly or by implication, that MEDICATIONS 4 LESS is offering a prescription medication discount which is affiliated with or endorsed the U.S. government when, in fact, no such affiliation or endorsement exists;

    b.    Representing, expressly or by implication, that a consumer has been approved for a discount on his or her prescription medications when, in fact, the consumer never applied to MEDICATIONS 4 LESS for a discount on his or her prescription medications;

    c.    Representing, expressly or by implication, that a consumer will receive a 50% discount on his or prescription medications when, in fact:

        i.    It is unknown to MEDICATIONS 4 LESS whether the consumer will realize any savings compared to what he or she is paying for his or her prescriptions, because MEDICATIONS 4 LESS does not know what prescription medications, if any, the consumer takes, and MEDICATIONS 4 LESS does not know what price the consumer pays for his or her prescription

22

medications; and

    ii.      The verification script for MEDICATIONS 4 LESS states that the savings will be between 30% and 50%;

d.    Omitting the material fact that, by reading the numbers at the bottom of his or her check, the consumer is enabling MEDICATIONS 4 LESS to debit money from his or her checking account with no further action on the consumer's part;

e.    Representing, expressly or by implication, that the consumer's checking account will not be debited until the consumer makes a final decision and takes some affirmative action to be billed when, in fact, MEDICATIONS 4 LESS causes the money to be debited from the consumer's checking account immediately after obtaining the consumer's checking account number and without further action by the consumer; and

f.    Debiting consumers' checking accounts or causing them to be debited using authorization obtained after a deceptive solicitation.

### COUNT V- TSR (EURO BANCA)

112.    Paragraphs 1 through 103 are incorporated herein by reference.

113.    In numerous instances, in connection with telemarketing, EURO BANCA has misrepresented, directly or by implication, material aspects of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer, in violation of 16 C.F.R. §310.3(a)(2)(iii).

### COUNT VI- TSR (EURO BANCA)

114.    Paragraphs 1 through 103 are incorporated herein by reference.

115.    In numerous instances, in connection with telemarketing, EURO BANCA has requested and
received from consumers payment of a fee in advance of obtaining an extension of credit
where EURO BANCA has guaranteed or represented a high likelihood of success in
obtaining an extension of credit to those consumers, in violation of 16 C.F.R. §310.4(a)(4).

### COUNT VII- CONSUMER FRAUD ACT (EURO BANCA)

116.    Paragraphs 1 through 103  are incorporated herein by reference.

117.    EURO BANCA engaged in a course of trade or commerce which constitutes unfair and
deceptive acts or practices declared unlawful under section 2 of the Act by, in the course of
placing telemarketing calls to, or causing telemarketing calls to be placed to, offering for
sale to, and selling  to Illinois consumers purported credit cards, purported cash advances,
and purported credit repair services and debiting Illinois consumers' checking accounts for
the same or causing such accounts to be debited for the same:

    a.    representing, expressly or by implication, that the consumer qualifies for a credit
card when, in fact, EURO BANCA makes its offer to all consumers it calls without
regard to whether they meet certain qualifications;

    b.    representing, expressly or by implication, that EURO BANCA is guaranteeing a
credit card to the consumer when, in fact, consumers have complained that they do
not receive a credit card from EURO BANCA;

    c.    representing, expressly or by implication, that EURO BANCA's offer is legal when,
in fact the TSR prohibits requesting or receiving payment of any fee in advance of

24

obtaining an extension of credit when the seller or telemarketer has guaranteed or represented a high likelihood of success in obtaining or arranging a loan or other extension of credit for a person;

d.  Omitting the material fact that, by reading the numbers at the bottom of his or her check, the consumer is enabling EURO BANCA to debit money from his or her checking account with no further action on the consumer's part;

e.  Representing, expressly or by implication, that the consumer's checking account will not be debited until the consumer makes a final decision and takes some affirmative action to be billed when, in fact, EURO BANCA causes the money to be debited from the consumer's checking account immediately after obtaining the consumer's checking account number and without further action by the consumer; and

f.  Debiting consumers' checking accounts or causing them to be debited using authorization obtained after a deceptive solicitation.

### COUNT VIII- CREDIT SERVICES ORGANIZATIONS ACT
### AS VIOLATION OF CONSUMER FRAUD ACT (EURO BANCA)

118.  Paragraphs 1 through 103  are incorporated herein by reference.

119.  EURO BANCA engaged in a course of trade or commerce which violates the Credit Services Organization Act, and, therefore, constitutes unfair and deceptive acts or practices declared unlawful under sections 2 of the Act by, in the course of offering and selling extensions of credit to Illinois consumers and debiting Illinois consumers' checking accounts for the same or causing such accounts to be debited for the same, knowingly engaging in the following acts or practices:

25

a.     Making untrue or misleading representations in the offer or sale of the services of a credit services organization in violation of Section 5 of the Credit Services Organizations Act, including:

   i.     The amount or type of credit a consumer can expect to receive as a result of the performance of the services offered; or

   ii.     The amount of credit improvement the consumer can expect to receive as a result of the services;

b.     Failing to provide to Illinois consumers, before the receipt by EURO BANCA of any money from the consumers, the written statement required by Section 6 of the Credit Services Organizations Act;

c.     Failing to provide to Illinois consumers a written contract and notice of three day right to cancel the contract as required by Section 7 of the Credit Services Organizations Act; and

d.     Failing to file a registration statement with the Illinois Secretary of State as required by Section 9 of the Credit Services Organizations Act.

**COUNT IX - TSR (GLOBAL BENEFITS, EILEEN DE OLIVEIRA, AND LEONARDO DE OLIVEIRA)**

120.   Paragraphs 1 through 103 are incorporated herein by reference.

121.   GLOBAL BENEFITS, EILEEN DE OLIVEIRA, and LEONARDO DE OLIVEIRA, in the course of and in connection with, providing to numerous sellers and telemarketers access to checking account debiting services, causing money to be debited from, bank accounts of Illinois consumers, and taking complaints,  inquiries, and refund requests about the same

from consumers located in Illinois and elsewhere, provided substantial assistance and support to sellers and telemarketers when GLOBAL BENEFITS, EILEEN DE OLIVEIRA, and LEONARDO DE OLIVEIRA knew or consciously avoided knowing that the sellers or telemarketers are engaged in a pattern or practices of acts that violate §310.3(a)(2)(iii), §310.4(a)(4) and §310.4(b)(iii)(B) of the TSR, in violation of §310.3(b) of the TSR.

### COUNT IX- CONSUMER FRAUD ACT
### (GLOBAL BENEFITS, EILEEN DE OLIVEIRA, AND LEONARDO DE OLIVEIRA)

122.   Paragraphs 1 through 103 are incorporated herein by reference.

123.   GLOBAL BENEFITS, EILEEN DE OLIVEIRA, and LEONARDO DE OLIVEIRA engaged in a course of trade or commerce which constitutes unfair and deceptive acts or practices declared unlawful under section 2 of the Act by, in the course of and in connection with, providing to numerous sellers and telemarketers access to checking account debiting services, causing money to be debited from bank accounts of consumers, including Illinois consumers, and taking complaints, inquiries, and refund requests about the same from consumers, including Illinois consumers, when GLOBAL BENEFITS, EILEEN DE OLIVEIRA, and LEONARDO DE OLIVEIRA knew and know that such sellers and telemarketers were engaging in and had engaged in a pattern or practice of violating the Consumer Fraud Act, the Credit Services Organizations Act, and the TSR.

124.   GLOBAL BENEFITS, EILEEN DE OLIVEIRA, and LEONARDO DE OLIVEIRA engaged in a course of trade or commerce which constitutes unfair acts or practices declared unlawful under section 2 of the Act by, in the course of and in connection with providing to numerous sellers and telemarketers access to checking account debiting services, causing money to be

debited from bank accounts of Illinois consumers, and taking complaints, inquiries, and refund requests about the same from consumers located in Illinois, failing to honor its contractual promise to refrain from causing consumers' checking accounts to be debited for sales that involve the payment of a fee to assist a consumer with improving his or her credit history or credit rating.

### PRAYER FOR RELIEF

WHEREFORE, the plaintiff prays that this honorable Court enter an Order:

A.  Awarding the plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief;

B.  Finding that GLOBAL BENEFITS has violated Section 310.3(b) of the TSR and Section 2 of the Consumer Fraud Act;

C.  Preliminarily and permanently enjoining GLOBAL BENEFITS from violating the TSR and the Consumer Fraud Act, both generally, and specifically, by enumerating the acts in which GLOBAL BENEFITS permanently is enjoined from engaging;

D.  Assessing a civil penalty in the amount of Fifty Thousand Dollars ($50,000) per violation of the Consumer Fraud Act found by the Court to have been committed by GLOBAL BENEFITS with the intent to defraud; if the Court finds GLOBAL BENEFITS has engaged in methods, acts or practices declared unlawful by the Consumer Fraud Act, without the intent to defraud, then assessing a statutory civil penalty of Fifty Thousand Dollars ($50,000), all as provided in section 7 of the Consumer Fraud Act;

E.     Requiring GLOBAL BENEFITS to pay all costs for the prosecution and investigation of this action, as provided by section 10 of the Consumer Fraud Act;

F.     Finding that EILEEN DE OLIVEIRA has violated Section 310.3(b) of the TSR and Section 2 of the Consumer Fraud Act;

G.     Preliminarily and permanently enjoining EILEEN DE OLIVEIRA  from violating the TSR and the Consumer Fraud Act, both generally, and specifically, by enumerating the acts in which EILEEN DE OLIVEIRA permanently is enjoined from engaging;

H.     Assessing a civil penalty in the amount of Fifty Thousand Dollars ($50,000) per violation of the Consumer Fraud Act found by the Court to have been committed by EILEEN DE OLIVEIRA with the intent to defraud; if the Court finds EILEEN DE OLIVEIRA has engaged in methods, acts or practices declared unlawful by the Consumer Fraud Act, without the intent to defraud, then assessing a statutory civil penalty of Fifty Thousand Dollars ($50,000), all as provided in section 7 of the Consumer Fraud Act;

I.     Requiring EILEEN DE OLIVEIRA to pay all costs for the prosecution and investigation of this action, as provided by section 10 of the Consumer Fraud Act;

J.     Finding that LEONARDO DE OLIVEIRA has violated Section 310.3(b) of the TSR and Section 2 of the Consumer Fraud Act;

K.     Preliminarily and permanently enjoining LEONARDO DE OLIVEIRA  from violating the TSR and the Consumer Fraud Act, both generally, and specifically, by enumerating the acts in which LEONARDO DE OLIVEIRA permanently is enjoined from engaging;

L.     Assessing a civil penalty in the amount of Fifty Thousand Dollars ($50,000) per violation

29

of the Consumer Fraud Act found by the Court to have been committed by LEONARDO DE OLIVEIRA with the intent to defraud; if the Court finds LEONARDO DE OLIVEIRA has engaged in methods, acts or practices declared unlawful by the Consumer Fraud Act, without the intent to defraud, then assessing a statutory civil penalty of Fifty Thousand Dollars ($50,000), all as provided in section 7 of the Consumer Fraud Act;

M.   Requiring LEONARDO DE OLIVEIRA to pay all costs for the prosecution and investigation of this action, as provided by section 10 of the Consumer Fraud Act;

N.   Finding that MEDICATIONS 4 LESS has violated Section 310.3(a)(2)(iii), Section 310.3(a)(2)(vii), and Section 310.4(b)(iii)(B) of the TSR, and Section 2 of the Consumer Fraud Act;

O.   Preliminarily and permanently enjoining MEDICATIONS 4 LESS from violating the TSR and the Consumer Fraud Act, both generally, and specifically, by enumerating the acts in which MEDICATIONS 4 LESS permanently is enjoined from engaging;

P.   Assessing a civil penalty in the amount of Fifty Thousand Dollars ($50,000) per violation of the Consumer Fraud Act found by the Court to have been committed by MEDICATIONS 4 LESS with the intent to defraud; if the Court finds MEDICATIONS 4 LESS has engaged in methods, acts or practices declared unlawful by the Consumer Fraud Act, without the intent to defraud, then assessing a statutory civil penalty of Fifty Thousand Dollars ($50,000), all as provided in section 7 of the Consumer Fraud Act;

Q.   Requiring MEDICATIONS 4 LESS to pay all costs for the prosecution and investigation of this action, as provided by section 10 of the Consumer Fraud Act;

30

R.      Finding that EURO BANCA has violated Section 310.3(a)(2)(iii) and Section 310.4(a)(4) of the TSR, Section 2 of the Consumer Fraud Act, and the Credit Services Organizations Act;

S.      Preliminarily and permanently enjoining EURO BANCA  from violating the TSR and the Consumer Fraud Act, both generally, and specifically, by enumerating the acts in which EURO BANCA permanently is enjoined from engaging;

T.      Assessing a civil penalty in the amount of Fifty Thousand Dollars ($50,000) per violation of the Consumer Fraud Act found by the Court to have been committed by EURO BANCA with the intent to defraud; if the Court finds EURO BANCA has engaged in methods, acts or practices declared unlawful by the Consumer Fraud Act, without the intent to defraud, then assessing a statutory civil penalty of Fifty Thousand Dollars ($50,000), all as provided in section 7 of the Consumer Fraud Act;

U.      Requiring EURO BANCA to pay all costs for the prosecution and investigation of this action, as provided by section 10 of the Consumer Fraud Act; and

V.      Awarding such relief as the Court finds necessary to redress injury to consumers resulting from the defendants' violations of the TSR, including but not limited to, damages for the residents of Illinois, rescission of contracts, the refund of monies paid, and the disgorgement of ill-gotten monies; and

W.      Awarding such other relief as justice and equity may require.

                         Respectfully submitted,

                         THE PEOPLE OF THE STATE OF

31

ILLINOIS, by LISA MADIGAN,
ATTORNEY GENERAL OF ILLINOIS

s/ Deborah Hagan

DEBORAH HAGAN
Chief, Consumer Fraud Bureau
Southern Region

s/ Elizabeth A. Blackston

Elizabeth A. Blackston #06228859

Attorney for Plaintiff

Consumer Fraud Bureau

Office of the Illinois Attorney General

500 South Second Street

Springfield, IL 62706

Telephone:  (217) 782-4436

Fax:     (217) 782-1097

E-mail: eblackston@atg.state.il.us